IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| HYON PAK and TAM BUI, husband and wife and the marital community comprised thereof, | ) ) ) ) | No. 68636-4-I |
| Appellants, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| DOMINIC SHIM, | ) ) | UNPUBLISHED OPINION |
| Respondent, | ) ) ) | |
| CHANG SHIM, and the marital community of DOMINIC SHIM and CHANG SHIM, | ) ) ) ) | |
| Third Party Defendants. | ) | FILED: September 16, 2013 |

SCHINDLER, J. — Dominic Shim sued Hyon Pak for breach of fiduciary duty, conversion and fraud. Pak contends the court erred in denying his motion to dismiss and substantial evidence does not support the conclusion that he breached a fiduciary duty and engaged in conversion and fraud. We affirm.

FACTS

Dominic Shim owned convenience stores in Arlington, Wenatchee, and Yakima. Hyon Pak was an attorney. Beginning in 2003, Pak represented Shim in a number of traffic infraction cases.

In 2006, Shim and Pak decided to make investments and purchase real property together. Shim refinanced his house and sold the Wenatchee convenience store to fund the investments. Shim gave Pak eight checks totaling $431,716.23: a check from the escrow trust account of Hanmi Law Offices at City Bank in Lynnwood for $56,076.20 payable to "Pak Law Offices;" four cashier's checks from Bank of America payable to Pak, one in the amount of $16,000 and three in the amount of $40,000; and three cashier's checks from Key Bank each in the amount of $79,880.01 and payable to Pak. Pak deposited the eight checks in his individual checking account at Washington Mutual.

In late 2006 or early 2007, Pak told Shim about an opportunity to invest in a privately held start-up technology company, Etelos, Inc. Pak agreed to purchase shares in Etelos and transfer half of the shares to Shim. Pak testified that in March, June, and October of 2007, he used $986,400 of his personal funds to purchase 2,266,000 shares in Etelos at $0.40 per share. When Shim asked Pak to transfer half of the shares to him, Pak told Shim for the first time that under federal securities laws, he could not transfer any of the shares until 12 months after Etelos made a public offering.

In March 2007, Shim and Pak established the "RAVE Kids Trust." Pak drafted the trust documents. The trust designates Shim and Pak as the sole trustees and beneficiaries. In early 2007, Pak entered into an agreement to purchase property in Kingston. Pak signed the purchase and sale agreement for $573,399.46 as a trustee of the RAVE Kids Trust. Pak paid $431,716.23 of the purchase price with the money from Shim and the remaining $141,683.23 with his own funds. On April 16, 2007, the Kingston property was conveyed by statutory warranty deed to the RAVE Kids Trust.

In May 2007, Shim obtained a home equity line of credit (HELOC) in the amount of $450,000. The HELOC was secured by a "Deed of Trust" on the Kingston property. Sometime before the closing date of the HELOC, Pak designated Shim as a joint account holder on his checking account at Washington Mutual. The proceeds from the HELOC were deposited into the joint account. In June, Pak made an online banking transfer of $275,000 from the joint account to his individual account at Washington Mutual.

In August or September 2007, Shim decided to sell the College Mart convenience store in Yakima. Shim retained Pak as his escrow agent. The purchaser agreed to pay $1,170,000 to buy College Mart. After the closing date in early October, Pak drafted promissory notes to secure the sale.

Acting as the escrow agent, Pak received two promissory notes from the purchaser totaling $41,335.02[1] and cash payments totaling $480,372.38. Each of the promissory notes state that "[t]his note shall be secured by a deed of trust on College Mart." But Pak never recorded a deed of trust on College Mart. Pak gave Shim a check for the proceeds from the College Mart sale. Pak deducted $30,000 from the proceeds for the broker's fee. Shim told Pak he did not hire him as a broker and did not agree to pay a broker's fee. Shim demanded a check for the full amount of the proceeds. Pak continuously refused to transfer the funds to Shim for the College Mart sale.

---

[1] With respect to the promissory notes, the purchaser of College Mart executed one promissory note for $20,000 plus interest at 12 percent, due and payable in full to Shim on December 30, 2007; and a second promissory note for $21,335.02 plus interest at 12 percent, due and payable in full to Shim on March 25, 2008.

3

In February 2008, Pak sent a letter to Shim telling him that Etelos planned to make a public offering in April 2008, and that Shim would receive stock certificates 12 months later. The letter states, in pertinent part,

> Etelos is currently a privately held company that will go public in April 2008. The shares, which you own, are part of a larger block of founder shares that cannot be trade[d] until at least 12 months after the public offering. When the founder shares are open for trading, you and your wife will receive stock certificates issued in your names by Etelos, Inc.

In April 2008, Etelos stock sold at an opening price of $1.50 per share, with a three-to-one stock split of its common shares. Pak did not transfer the Etelos shares to Shim 12 months later as promised. Pak transferred 411,000 shares to Shim in early 2010 after the share price had plummeted in value.

On February 17, 2010, Shim filed a complaint against Pak alleging breach of fiduciary duty, conversion and fraud.[2] Shim and Pak testified during the two-day bench

---

[2] The complaint alleges, in pertinent part:

**A.** *Conversion*

. . . .

47.     Defendant Hyon Pak's acceptance of Mr. Shim's money interfered with his right to his money from October, 2007 up to the present time.

. . . .

49.     Defendant Hyon Pak['s] receipt and possession of funds from a line of credit . . . interfered with Mr. Shim's right to those funds.

50.     Defendant Hyon Pak's purchase, on behalf of Mr. Shim, of shares of Etelos, Inc. stock interfered with his right to possession of the stock.

51.     Defendant Hyon Pak possessed intent to interfere with Mr. Shim's right of possession to his property.

52.     The actions of the Defendant Hyon Pak caused the deprivation of Mr. Shim's right of possession to his property.

. . . .

**B.** *Fraud*

. . . .

55.     Defendant Hyon Pak falsely represented his intention to fulfill his duty as escrow agent to transfer the proceeds of the sale of College Mart to Mr. Shim following the sale.

56.     Defendant Hyon Pak knowingly made these false representations to Mr. Shim with respect to his role as escrow agent in the sale of College Mart.

. . . .

58.     Defendant Hyon Pak knowingly made false representations to Mr. Shim regarding the line of credit . . . .

trial, and the court admitted into evidence over 150 exhibits. At the close of Shim's case, Pak moved to dismiss the lawsuit for failure to name the real party in interest. The trial court denied the motion to dismiss.

At the conclusion of the trial, the court ruled that Pak breached a fiduciary duty and committed conversion and fraud with respect to the HELOC and College Mart transactions.[3] The court entered extensive and detailed written findings of fact and conclusions of law that address each business transaction in chronological order and employ a running total to determine the amount owed.

---

59. Defendant Hyon Pak knowingly made false representations and refused to provide an accounting to Mr. Shim regarding the details of the shares of stock of Etelos, Inc.

60. Defendant Hyon Pak's intent in making these false representations was to gain Mr. Shim's assent to enter into the fraudulent agreements.

61. Mr. Shim was entirely ignorant of Defendant Hyon Pak's deceit at the time of the agreements and relied on the truth of Defendant Hyon Pak's representations.

62. Mr. Shim was acting in good faith, and was within right, in his reliance on Defendant Hyon Pak's representations.

63. Damages incurred to Mr. Shim are the direct result of Defendant Hyon Pak's fraudulent representations.

. . . .

**C.     Breach of Fiduciary Duty**

. . . .

66. The agreement between Defendant Hyon Pak and Mr. Shim for Defendant Hyon Pak to fulfill his duties as escrow agent in the sale of College Mart gave rise to a fiduciary duty on the part of Defendant Hyon Pak.

. . . .

68. The agreement between Defendant Hyon Pak and Mr. Shim for Defendant Hyon Pak to fulfill his duties as acquirer of an investment property located in Kingston, WA gave rise to a fiduciary duty on the part of Defendant Hyon Pak.

69. The agreement between Defendant Hyon Pak and Mr. Shim for Defendant Hyon Pak to fulfill their duties as acquirer of shares of Etelos, Inc. stock gave rise to a fiduciary duty on the part of the Defendant Hyon Pak.

70. Defendant Hyon Pak breached his duties to Mr. Shim, with respect to his role as escrow agent in the sale of College Mart.

. . . .

72. Defendant Hyon Pak breached his duties to Mr. Shim by liquidating the line of credit in his name . . . .

73. Defendant Hyon Pak breached his duties to Mr. Shim by improperly holding and failing to provide an accounting of the shares of Etelos, Inc. stock.

74. Mr. Shim suffered damages as a result of Defendant Hyon Pak's breach of fiduciary duties.

[3] The court also concluded Pak breached a fiduciary duty to Shim with respect to the purchase of the Etelos shares.

The court found that following the purchase of the Kingston property and the HELOC transaction, Pak owed Shim $311,720.74. The court offset that amount against the value of the Etelos stock that Pak transferred to Shim. The court found that following the sale of College Mart, Pak then owed Shim $521,707.40. After accounting for payments that Pak made to Shim, the court found that the total amount that Pak owed Shim was $520,972. The court also found that Shim and Pak jointly owned the Kingston property. The court entered a judgment against Pak for $520,972 at 12 percent interest, and ordered the parties to "determine the appropriate method for transferring the [Kingston] property from one to the other." Pak appeals.[4]

## ANALYSIS

### Motion to Dismiss

Pak contends the trial court erred in denying his motion to dismiss the claims related to the College Mart transaction. Pak asserts the real party in interest is College Mart, not Shim. We review the trial court's decision on a motion to dismiss for abuse of discretion. Sprague v. Sysco Corp., 97 Wn. App. 169, 171-72, 982 P.2d 1202 (1999).

CR 17(a) states that every action shall be brought in the name of the real party in interest.[5] But where a defendant fails to timely raise a real party in interest defense, the defense is waived. Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App.

---

[4] The trial court denied Pak's motion for reconsideration.

[5] CR 17(a) provides:

Real Party in Interest. Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

707, 716, 899 P.2d 6 (1995); see also Gogolin & Stelter v. Karn's Auto Imports, Inc., 886 F.2d 100, 102 (5th Cir. 1989); Hefley v. Jones, 687 F.2d 1383, 1388 (10th Cir. 1982).[6] Because Pak did not raise the real party in interest defense until the close of Shim's case, the trial court did not abuse its discretion by denying the motion to dismiss.

Substantial Evidence

Pak argues substantial evidence does not support the trial court's conclusion that he breached a fiduciary duty and engaged in conversion and fraud.

We review the trial court's findings of fact and conclusions of law to determine whether substantial evidence supports the findings of fact and, in turn, whether the findings support the conclusions of law. Scott v. Trans-Sys., Inc., 148 Wn.2d 701, 707-08, 64 P.3d 1 (2003). Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person that the premise is true. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). The court views the evidence and all reasonable inferences in the light most favorable to the prevailing party. Korst v. McMahon, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006).

We defer to the trial court's determination regarding conflicting evidence and credibility of the witnesses. Weyerhaeuser v. Tacoma-Pierce County Health Dep't, 123 Wn. App. 59, 65, 96 P.3d 460 (2004); Fisher Props., Inc. v. Arden-Mayfair, Inc., 115 Wn.2d 364, 369-70, 798 P.2d 799 (1990).

Where there is substantial evidence, this court will not substitute its judgment for that of the trial court, "even though we might have resolved a factual dispute differently." Korst, 136 Wn. App. at 206.

---

[6] Because the text of the state and federal rules is identical, federal case law interpreting the federal rule is persuasive authority for interpreting the state rule. See Rinke v. Johns-Manville Corp., 47 Wn. App. 222, 225, 734 P.2d 533 (1987).

"The party challenging a finding of fact bears the burden of showing that it is not supported by the record." Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wn. App. 422, 425, 10 P.3d 417 (2000). RAP 10.3(g) provides that "[a] separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number."[7] Unchallenged findings are verities on appeal. Moreman v. Butcher, 126 Wn.2d 36, 40, 891 P.2d 725 (1995).

Pak contends substantial evidence does not support the conclusion that he engaged in conversion of the HELOC funds. " '[C]onversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it.' " Westview Invs., Ltd. v. U.S. Bank Nat'l Ass'n, 133 Wn. App. 835, 852, 138 P.3d 638 (2006)[8] (quoting Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys., 104 Wn.2d 353, 378, 705 P.2d 1195 (1985)). Money may be the subject of conversion in Washington where " 'it was wrongfully received by the party charged with conversion, or . . . such party was under obligation to return the specific money to the party claiming it.' " Westview, 133 Wn. App. at 852 (quoting Wash. Pub. Power, 104 Wn.2d at 378).

The court found that Shim obtained the HELOC in his individual capacity and that without Shim's consent, Pak transferred $275,000 of the HELOC funds from the joint account to his individual account. The findings state, in pertinent part:

> 17.    On or about May 26, 2007, two months after the Kingston Property
> was purchased, Plaintiff Shim knowingly signed a Washington Mutual
> Home Equity Line of Credit ("HELOC") in his individual capacity in the

---

[7] Here, Pak did not separately identify and assign error to the findings of fact made by the trial court.

[8] (Alteration in original.)

amount of $450,000.00. Plaintiff Shim is the party solely liable to repay the HELOC under the HELOC documents.

. . . .

20. The proceeds of the HELOC were directly deposited into [the Washington Mutual] Joint Account.

. . . .

24. On June 4, 2007, an online banking transfer of $275,000.00 of the HELOC funds was transferred from the Joint Account into one of Defendant Pak's individual Washington Mutual accounts without the consent of Plaintiff Shim.

The evidence supports the findings. The undisputed evidence established that Shim obtained a HELOC in the amount of $450,000 and was solely responsible for repaying the HELOC. Shim testified that he contributed the $450,000 from the HELOC to the joint investment pool and the RAVE Kids Trust. Shim said that he did not agree to place the HELOC funds into the joint account and was unaware that Pak transferred funds from the joint account to Pak's personal account.

Shim said that Pak told him that he deposited the money into several different accounts but would not provide Shim with any information about the accounts.

> He didn't give me the record of the, where the trust money was. When I, I
> . . . keep asking him for it and, uh, he said he put it into the, several
> different accounts so he cannot provide it right away. He . . . said he was
> going to give it to me and come up with some sort of excuse to put it off
> and put it off. So I wasn't sure where the money was.

Substantial evidence supports the finding which in turn supports the conclusion that Pak engaged in conversion by withdrawing $275,000 of the HELOC funds from the joint account without Shim's consent.[9]

Pak also contends substantial evidence does not support the conclusion that he breached a fiduciary duty by failing to place the funds from the College Mart sale in an

---

[9] Because substantial evidence supports the conclusion that Pak converted the HELOC funds, we need not address Pak's arguments as to breach of fiduciary duty and fraud with respect to the HELOC transaction.

9

escrow account, refusing to transfer the proceeds of the sale to Shim, and failing to provide a timely accounting.

An escrow agent occupies a fiduciary relationship with all parties to the escrow. Nat'l Bank of Wash. v. Equity Investors, 81 Wn.2d 886, 909-10, 506 P.2d 20 (1973), superceded by statute on other grounds, LAWS OF 1973, 1st Ex. Sess., ch. 47, § 3. Escrow agents must act strictly in accordance with the provisions of the escrow agreement; they must comply with the instructions of the parties, and it is their duty to exercise ordinary skill and diligence, and due or reasonable care in their employment. Equity Investors, 81 Wn.2d at 910. Acting in a fiduciary capacity, escrow agents must also conduct the affairs with which they are entrusted with scrupulous honesty, skill, and diligence. Equity Investors, 81 Wn.2d at 910.

Here, the evidence supports the conclusion that Pak breached his fiduciary duty as an escrow agent because he "failed to obtain written escrow instructions, failed to negotiate an escrow fee, failed to deposit funds in a trust account, and failed to make a timely accounting of the proceeds," and "has continuously refused to transfer the funds from the proceeds of the sale" to Shim.[10]

Shim testified that Pak "didn't give me any papers" during the closing of the College Mart sale.

> Q: So you never received any of the closing documents?
> A: I did not. Or title insurance, or anything like that. I haven't received anything.
> Q: Do you know where the originals are?

---

[10] The evidence establishing that Pak breached his fiduciary duty as an escrow agent also supports the trial court's conclusion that Pak engaged in conversion and fraud as to the College Mart transaction. To prove fraud, a claimant must establish (1) representation of an existing fact, (2) materiality, (3) falsity, (4) knowledge that the statement is false, (5) intent that it should be acted on by the person to whom it is made, (6) ignorance of its falsity, (7) reliance on the truth of the representation, (8) the right to rely on it, and (9) damage. Adams v. King County, 164 Wn.2d 640, 662, 192 P.3d 891 (2008).

A:     I don't know.

Shim testified that after he refused to pay Pak a $30,000 brokerage fee, Pak did not deliver the proceeds of the sale.

Q:     So did Mr. Pak ever give you the funds?
A:     He brought a cashier's check. I asked him to bring me the cashier's check. He brought a cashier's check. Had the brokerage fee taken out and I refused to take that cashier's check. I asked him to include that $30,000 [that Pak withheld as a broker's fee] in [the cashier's check amount].
Q:     So you never instructed him to hold it for you?
A:     No.
Q:     So that-- so did he ever-- after you told him to give you the proper amount of the cashier's check did he ever try to give you the funds?
A:     He did not.
. . . .
Q:     So you have not received anything from this transaction?
A:     No. He didn't give it to me again.
. . . .
Q:     Have you asked the defendant for, for money to pay-- for the money from this transaction?
A:     Yes, I have. Many times.

Pak also contends substantial evidence does not support the conclusion that he committed legal malpractice because there is no evidence of an attorney-client relationship in 2007 when the parties began to carry out their joint investments, and Shim did not introduce expert testimony on breach of the duty of care. But Shim did not allege legal malpractice in the complaint and the court did not address legal malpractice. The issue at trial was whether Pak breached a fiduciary duty to Shim as his <u>escrow agent</u>, not as his attorney.[11]

---

[11] Without citation to authority, Pak challenges the trial court's conclusion that he breached a fiduciary duty for failing to account for the purchase of Etelos stock because no accounting was required until the stock became transferable 12 months after Etelos issued a public offering. We do not consider issues that are not supported by citation of authority. RAP 10.3(a)(6); <u>McKee v. Am. Home Prods. Corp.</u>, 113 Wn.2d 701, 705, 782 P.2d 1045 (1989).

Admission of Evidence

Pak also contends that the trial court erred in admitting copies of two of the Key Bank cashier's checks. Shim testified that he gave Pak three cashier's checks from Key Bank each in the amount of $79,880.01. The court admitted photocopies of the cashier's checks and used the amount of the checks in calculating the total amount owed. Pak claims admission of the copies of the cashier's checks violated the best evidence rule.

We review a trial court's decision to admit an exhibit into evidence for abuse of discretion. Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668, 230 P.3d 583 (2010). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. Salas, 168 Wn.2d at 668-69. A duplicate of a written instrument is admissible to the same extent as an original unless there is a genuine question raised as to the authenticity of the original, or it would be unfair to admit the duplicate. ER 1003. The requirement of authenticity is satisfied by evidence sufficient to support that the evidence is what its proponent claims. ER 901(a). When a witness with knowledge identifies the evidence as being what it is claimed to be, the authenticity requirement is satisfied. ER 901(b)(1).

The evidence at trial showed Exhibit 20 and Exhibit 23 were the best available copies of the cashier's checks. Shim testified that he purchased three cashier's checks from Key Bank with money from refinancing his house and gave the checks to Pak. Pak challenges admission of two of the three Key Bank cashier's checks, Exhibit 20 check number 001494010 and Exhibit 23 check number 001494012. Pak does not challenge the admission of Exhibit 21 check number 00149011. Shim testified that he

purchased all three of the Key Bank cashier's checks at the same time and they were each for the same amount, $79,880.01. The checks are numbered sequentially. The amount of $79,880.01 is clearly legible on Exhibit 21 check number 001494011. Further, Pak's signature is clearly legible on the back of each of the Key Bank cashier's checks in the sequence. The trial court did not abuse its discretion in admitting two of the Key Bank cashier's checks and including the amounts of those checks in its calculation of the total amount owed.[12]

We conclude substantial evidence supports the trial court's conclusion that Pak breached a fiduciary duty and engaged in conversion and fraud.[13]

We affirm.

WE CONCUR:

---

[12] Pak also contends the trial court erred by including in its calculations of the total amount owed a check written by Shim's brother for $30,000 payable to Pak. But the trial court did not admit the check into evidence, and there is no evidence that the court used the check amount in determining the total amount owed.

[13] Because Shim does not provide argument or citation to authority to support his request for attorney fees, we decline to award attorney fees. RAP 18.1(b); Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 710-11 n.4, 952 P.2d 590 (1998) ("The rule requires more than a bald request for attorney fees on appeal. Argument and citation to authority are required under the rule to advise us of the appropriate grounds for an award of attorney fees as costs." (Internal citations omitted.)).